**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**AT CLARKSBURG**

ELECTRONICALLY
FILED
Feb 23 2022
U.S. DISTRICT COURT
Northern District of WV

**TYLER J. CARROLL,**

**Plaintiff,**

**v.**

Civil Action No: 1:22-CV-14 _____

(Judge____Kleeh_____)

**WESTFIELD NATIONAL
INSURANCE COMPANY,**

**Defendant.**

## COMPLAINT FOR DECLARATORY RELIEF

COMES NOW Plaintiff, Tyler J. Carroll through his undersigned counsel, pursuant to Rule 57 of the Federal Rules of Civil Procedure, 28 U.S.C. §2201, and W.Va. Code 55-13-1 *et seq.*, and for his Complaint for Declaratory Relief states as follows:

### JURISDICTION

1.    Plaintiff, Tyler J. Carroll, is a citizen and resident of Kanawha County, West Virginia.

2.    Defendant Westfield National Insurance Company is a foreign corporation, with its principal place of business in the State of Ohio, and is authorized to offer insurance for sale in the State of West Virginia and transacts business in Braxton County, West Virginia.

3.    This Court has venue and jurisdiction over this matter pursuant to 28 U.S.C. § 2201 based upon complete diversity of citizenship between the parties, and the amount in controversy exceeds the sum or value of $75,000.00.

## PREAMBLE

4.      On June 28, 2021, Plaintiff placed Westfield National Insurance Company on notice of his uninsured/underinsured motorist claim arising out of catastrophic injuries and damages he sustained as the result of a work-related motor vehicle accident on May 4, 2021, and Westfield's duty or obligation to afford him coverage for his claims under a Business Auto Policy issued to his employer, West Virginia Heating & Plumbing.

5.      Plaintiff is filing the subject Complaint for Declaratory Relief to determine his rights and Westfield's responsibilities under an insured policy or policies issued to West Virginia Heating & Plumbing, the Plaintiff's employer.

## FACTUAL BACKGROUND

6.      On May 4, 2021, plaintiff, Tyler J. Carroll, was the operator of a 2014 GMC Savanna Van motor vehicle owned by West Virginia Heating & Plumbing (hereinafter "WVH&P") and specifically identified and insured under the Westfield WVH&P Business Auto Policy No. TRA-4175404.

7.      On May 4, 2021, Leonard "Ernie" Bragg (hereinafter "Bragg") was Plaintiff's WVH&P supervisor and a passenger in the 2014 GMC Savanna Van operated by Plaintiff.

8.      On May 4, 2021, Charles T. Batton, was the owner and operator of a 1999 Chevrolet S-10 motor vehicle.

9.      On May 4, 2021, Kristy L. Pechinko, was the owner and operator of a 2013 Chevrolet Cruze motor vehicle.

2

10.    At all times mentioned herein, the Plaintiff was a Class 2, 3rd Year Building Trades Apprentice employed by West Virginia Heating & Plumbing and was acting within the scope of employment and in furtherance of the employer's business.

11.    Plaintiff's home-work community was the Charleston, West Virginia area.

12.    At all times mentioned herein, Bragg was the Plaintiff's supervisor and was a Journeyman employed by WVH&P and was acting within the scope of his employment and in furtherance of the WVH&P's business.

13.    In May of 2021, plaintiff and WVH&P supervisor Bragg were assigned by WVH&P to a job at the Joseph F. Weis, Jr., Jr. United States Courthouse located at 550 Grant Street, Pittsburgh, Pennsylvania.

14.    On May 2, 2021, Plaintiff loaded the 2014 GMC Savanna Van motor vehicle owned by WVH&P with tools, equipment, supplies, and material owned by WVH&P and needed to perform the job at the Joseph F. Weis, Jr., Jr. United States Courthouse in Pittsburgh, Pennsylvania.

15.    On May 3, 2021, Plaintiff drove the 2014 GMC Savanna Van owned by WVH&P with Supervisor Bragg as his passenger and traveled to the Joseph F. Weis, Jr., Jr. United States Courthouse in Pittsburgh, Pennsylvania to perform work on behalf of WVH&P.

16.    On May 3, 2021, Plaintiff and Supervisor Bragg performed work on behalf of WVH&P at the Joseph F. Weis, Jr., Jr. United States Courthouse in Pittsburgh, Pennsylvania.

17.    After completing the workday on May 3, 2021, Plaintiff and Supervisor Bragg traveled in the WVH&P Van to the Greentree by Hilton located at 500 Mansfield Avenue, Pittsburgh, Pennsylvania where they spent the overnight.

18.    The next morning on May 4, 2021, Plaintiff and Supervisor Bragg left the Greentree by Hilton hotel and traveled in the WVH&P Van back to the job site at the Joseph F. Weis, Jr., Jr. United States Courthouse in Pittsburgh, Pennsylvania to continue the WVH&P work assignment.

19.    WVH&P paid the May 3, 2021 and May 4, 2021 travel expenses for Plaintiff and Supervisor Bragg including meals, fuel, and overnight stay at the Greentree by Hilton.

20.    On May 4, 2021, Plaintiff and Supervisor Bragg performed work on behalf of WVH&P at the Joseph F. Weis, Jr. United States Courthouse in Pittsburgh, Pennsylvania until approximately 5:30 p.m.

21.    At approximately 5:30 p.m., the men finished the on-site work, Plaintiff and Supervisor Bragg began to gather the WVH&P tools and remaining WVH&P materials.

22.     Plaintiff and Supervisor Bragg carried and transported multiple loads of tools to the WVH&P van on a dolly and organized the tools and materials before leaving the job site.

23.    Plaintiff and Supervisor Bragg departed the Joseph F. Weis, Jr. United States Courthouse in Pittsburgh, Pennsylvania at approximately 6:30 p.m.

24.    Plaintiff and Supervisor Bragg stopped to top off the WVH&P company van gas tank before leaving Pittsburgh to travel back to Charleston, West Virginia.

25.    Plaintiff and Supervisor Bragg stopped at a BFS in Morgantown, West Virginia at 7:47 p.m. to purchase gasoline.

26.    Plaintiff and Supervisor Bragg obtained drive-thru food in Morgantown and sat in the parking lot to eat.

27.    After finishing their food, Plaintiff and Supervisor Bragg left Morgantown, West Virginia traveling Southbound on Interstate 79 towards Charleston, Kanawha County, West Virginia.

28.    At approximately, 9:05 p.m. Plaintiff and Supervisor Bragg passed the Sutton exit when they observed a 1999 Chevy S-10 truck, traveling north, veer into the median and barrel roll into the southbound side of Interstate 79 causing the Plaintiff to take evasive action to avoid physical contact between the vehicles.

29.    Physical contact would have occurred between the WVH&P van operated by Tyler Carroll and the out-of-control vehicle operated by Charles T. Batton but for Tyler Carroll taking evasive action to avoid impact between the vehicles.

30.    After taking evasive action to avoid physical contact between the WVH&P van he was operating and the out-of-control vehicle operated by Charles T. Batton, Plaintiff steered the WVH&P to rest on the right-side shoulder of the I-79 southbound lanes.

31.   The out-of-control Chevy S-10 Truck came to a rest in and across the southbound lanes of Interstate 79, facing south.

32.   Plaintiff observed substantial damage to the 1999 Chevy S-10 and that the operator of the vehicle appeared to be unconscious.

33.   Plaintiff enacted safety protocol on the 2014 GMC Savanna Van owned by WVH&P by ensuring the vehicle was out of the roadway and activating the vehicle's emergency flashers and interior dome light before exiting the vehicle to render aid to Charles T. Batton.

34.   After confirming that there was no oncoming southbound vehicular traffic on I-79, the Plaintiff crossed the southbound lanes of I-79 and went to the driver's side door of the 1999 Chevrolet S-10 motor vehicle and began rendering aid to the unconscious occupant, Charles T. Batton.

35.   At about the same time, Supervisor Bragg went to the rear of the 2014 GMC Savanna Van owned by WVH&P, remaining on the southbound shoulder of the road with his cell phone flashlight engaged to wave at and alert oncoming traffic in the southbound lanes of I-79.

36.   Thereafter, a tractor-trailer approached the crash scene in the right-hand lane of southbound I-79 and was able to slow and stop without crashing into either the 2014 GMC Savanna Van owned by WVH&P or the 1999 Chevrolet S-10.

37.   Thereafter, a second vehicle approached the crash scene from the southbound I-79 lanes and was able to slow and stop without crashing into either the 2014 GMC

6

Savanna Van owned by WVH&P or the 1999 Chevrolet S-10.

38.    Thereafter, a third vehicle, a 2013 Chevrolet Cruze motor vehicle owned and operated by Kristy L. Pechinko, approached the crash scene in the right-hand lane of southbound I-79 at a high rate of speed.

39.    The 2013 Chevrolet Cruze motor vehicle owned and operated by Kristy L. Pechinko, abruptly passed the slowed or stopped 2nd vehicle and the slowed or stopped tractor-trailer in the right-hand lane of southbound I-79 and at a high rate of speed veering into the left lane and then striking the 1999 Chevrolet S-10 owned and operated by Charles T. Batton near the driver's door and into Plaintiff who was working to free Charles T. Batton from his disabled vehicle.

40.    Physical contact would have occurred between the WVH&P van operated by Plaintiff and the vehicle operated by Kristy L. Pechinko but for the Plaintiff taking evasive action to avoid the out-of-control vehicle operated by Charles T. Batton and then maneuvering the WVH&P van to the southbound shoulder of Interstate 79.

41.    Plaintiff was thrown into the grassy median upon impact by Kristy L. Pechinko's 2013 Chevrolet Cruze motor vehicle and the Charles T. Batton's 1999 Chevrolet S-10 was spun further down the southbound lanes of I-79.

42.    The 2013 Chevrolet Cruze motor vehicle driven by Kristy L. Pechinko came to rest in the median of I-79.

43.    Plaintiff sustained, among other injuries, multiple fractures resulting in an above-the-knee amputation of his left leg, right leg tib-fib fracture; right and left arm

fractures; and a skull fracture, all of which were life-threatening injuries and a direct result of the vehicle crash.

44.    At the time of the crash, Charles T. Batton was insured by State Farm Insurance Company with liability insurance limits of $25,000.00.

45.    At the time of the crash, Charles T. Batton was underinsured with insufficient liability limits for the injuries and damages incurred by the Plaintiff.

46.    At the time of the crash, Kristy Pechinko was uninsured.

## THE POLICIES

47.    Westfield National Insurance Company issued Policy No. TRA-4175404 ("the Policy") to West Virginia Heating & Plumbing with effective coverage dates of 7/1/2020-7/1/2021.

48.    The Westfield Policy has a $1,000,000.00 per accident liability limit and commercial excess coverage with limits of $2,000,000.00 written on form CA0001(10/13) confirmed by Westfield Casualty Claim Specialist, Sharon Grady and certified by Westfield Authorized Representative, Jessica Javorsky. **Exhibit 1**

49.    The Westfield Policy provides, in pertinent part, as follows:

**A.  Coverage**

   1. We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured" or underinsured motor vehicle." The damages must result from "bodily injury" sustained by the "insured" or "property damage" caused by an "accident". The owner's or driver's liability for these damages must result from the ownership maintenance or use or the "uninsured" or "underinsured motor vehicle."

2.  With respect to damages resulting from an "underinsured motor vehicle", we will pay under this coverage only if a. or b. below applies:

    a.  The limits of any applicable liability bonds or policies have been exhausted by payment of judgments or settlements; or

    b.  A tentative settlement has been made between an "insured" and the insurer of the "underinsured motor vehicle", and we:

(1)  Have been given prompt written notice of such tentative settlement, and
(2)  Advance payment to the "insured" in an amount equal to the tentative settlement within 30 days after receipt of notification.

**WESTFIELD INSURANCE COVERAGE ISSUE**

50.  Charles T. Batton was insured under a policy of insurance issued by State Farm Insurance Company with a $25,000.00 liability limit.

51.  Kristy L. Pechinko was uninsured.

52.  Upon information and belief, WVH&P paid all premiums as due and has otherwise complied with all of the terms and conditions of its Policy with Westfield.

53.  The Westfield Policy affords coverage for uninsured and underinsured claims of Tyler Carroll that he is legally entitled to recover from the owner or operator of an uninsured motor vehicle or underinsured motor vehicle.

54.  Following the May 4, 2021 motor vehicle crash, Plaintiff presented a liability claim to State Farm, the insurance carrier for Charles T. Batton under his personal automobile policy of insurance.

55.  Following the May 4, 2021 motor vehicle crash, Plaintiff presented an underinsured motorists claim and an uninsured motorist claim to State Farm, his own automobile insurance carrier.

56.    Thereafter, Plaintiff presented an underinsured motorist claim and an uninsured motorist claim to Westfield under Westfield Policy No. TRA-4175404.

57.    Westfield identified Plaintiff's underinsured motorists claim and uninsured motorist claim arising out of the plaintiff's injuries as Claim Number 002251078.

58.    After obtaining Westfield's consent and waiver of subrogation, Plaintiff reached a settlement with State Farm, the liability carrier for Charles T. Batton whereby State Farm paid to the Plaintiff the per person limits of liability coverage provided by State Farm's policy of insurance of $25,000.00.

59.    Thereafter, Plaintiff reached an agreement with State Farm to pay the Plaintiff his own uninsured motorist coverage limits resulting from the fault of Kristy Pechinko, who was uninsured.

60.    Thereafter, Plaintiff reached an agreement with State Farm to pay the Plaintiff his own underinsured motorist coverage limits as the result of a less than full recovery of compensation for the fault of Charles T. Batton.

61.    Charles T. Batton's negligence and Kristy L. Pechinko's negligence were independent proximate causes of the May 4, 2021 motor vehicle accident and the grave injuries and damages caused to Plaintiff.

62.    Westfield has acknowledged that Charles T. Batton was an underinsured motorist, as that term is defined under West Virginia law and the applicable policy language of the policy of insurance issued by Westfield to the WVH&P.

63.  Westfield has acknowledged that Kristy L. Pechinko was an uninsured motorist, as that term is defined under West Virginia law and the applicable policy language of the policy of insurance issued by Westfield to the WVH&P.

64.  The independent liabilities of Charles T. Batton and Kristy L. Pechinko are clear, and the Plaintiff's damages arising from the motor vehicle crash greatly exceed the total liability insurance limits available from Batton and Pechinko.

65.  Pursuant to the terms of its WVH&P insurance policy, Westfield, in its capacity as the underinsured motorist carrier and uninsured motorist carrier is obligated to pay to Plaintiff the policy limits of underinsured motorists' coverage and uninsured motorist coverage as compensation for the losses and damages he sustained as a result of the accident of May 4, 2021, caused by the acts and/or omissions of Batton, an underinsured motorist and Pechinko an uninsured motorist.

66.  By letter dated July 14, 2021, Westfield by its authorized representative, Jessica Javorsky and Sharon Grady, its Casualty Claim Specialist certified a true and correct copy of the Policy with an effective date of 7/1/2020 to 7/1/2021.  **Exhibit 1**

67.  By letter dated September 2, 2021, Westfield by its Casualty Claim Specialist, Sharon Grady confirmed the WVH&P liability limits of $1,000,000.00 and commercial excess liability limits of $2,000,000.00 under Policy No. TRA-4175404 with relevant dates of 7/1/2020 to 7/1/2021.  **Exhibit 2**

68.  The Westfield Business Automobile Insurance Policy and the Commercial Auto Excess Policy include Underinsured Motorist Coverage Offer (Single Limits) forms

that are unsigned, undated, and non-selected which Westfield certified as true and correct.

69.   The Westfield Business Automobile Policy and the Commercial Auto Excess Policy include Uninsured Motorist Coverage Offer (Single Limits) forms that are unsigned, undated and non-selected with Westfield certified as true and correct.

70.   The unsigned, undated and non-selected forms do not constitute either a commercially reasonable offer or a knowing informed waiver of uninsured or underinsured coverage.

71.   In 1998, Mary Beth Johnson became employed at WVH&P as a Project Manager, Estimator.

72.   In 2006, Mary Beth Johnson became the President and Owner of WVH&P.

73.   At the time she because the President and Owner, WVH&P's business insurance needs were handled, provided, and managed by BB&T Carson.

74.   In or about 2013, Mary Beth Johnson withdrew all of her commercial insurance business from BB&T Carson and placed it with Mountain State Insurance Agency located at 1206 Kanawha Blvd. East, Charleston, West Virginia.

75.   At all times material herein, Mountain State Insurance Agency was authorized to take applications and bind insurance policies with Westfield.

76.   Mountain State Insurance Agency is owned and operated by Ross Johnson, a Certified Insurance Counselor.

77.    Ross Johnson is the uncle of Mary Beth Johnson.

78.    Sometime in or after 2013, WVH&P applied to Westfield for business automobile liability insurance coverage and commercial auto excess coverage.

79.    At the time of application for a business automobile liability insurance coverage and commercial auto excess liability coverage, Westfield was required to offer UM coverage and optional UIM coverage to WVH&P for using the forms specified by the West Virginia Insurance Commissioner.

80.    Sometime in or after 2013, Westfield through the Mountain State Insurance Agency issued WVH&P a Business Auto Policy with liability limits of $1,000,000.00.

81.    Sometime in or after 2013, Westfield through the Mountain State Insurance Agency issued WVH&P a Commercial Auto Excess Policy with liability limits of $2,000,000.00.

82.    The Selection/Rejection forms promulgated by the West Virginia Insurance Commission require Westfield to provide the option of purchasing Uninsured Motorist coverage and Underinsured Motorist coverage with the Business Auto Policy and the Commercial Auto Excess Policy in an amount equal to the liability limits.

83.    The Selection/Rejection forms promulgated by the West Virginia Insurance Commission require Westfield to provide the option of purchasing UM and UIM coverage with the Business Auto Policy and the Commercial Auto Excess Policy in an amount equal to the liability limits and require the insured or applicant select or

reject the offered coverage in his or her own handwriting or by appropriate electronic means.

84.    The Selection/Rejection forms promulgated by the West Virginia Insurance Commission require Westfield to provide the option of purchasing UM and UIM coverage with the Business Auto Policy and the Commercial Auto Excess Policy in an amount equal the liability limits, to acknowledge in his or her own handwriting or by appropriate electronic means that he or she read the Important Notice attached on the UM and UIM coverage and acknowledge that he or she understands how the coverage works.

85.    The Selection/Rejection forms promulgated by the West Virginia Insurance Commission require Westfield to provide the option of purchasing UM and UIM coverage with the Business Auto Policy and the Commercial Auto Excess Policy in an amount equal to the liability limits, to acknowledge in his or her own handwriting or by appropriate electronic means to acknowledge he or she has been given the opportunity to select the limits of UM or UIM coverage set forth in the Mandatory Liability Limits Offer and have selected the coverage that matches the choice checked.

86.    The Selection/Rejection forms promulgated by the West Virginia Insurance Commission require Westfield to provide the option of purchasing UM and UIM coverage with the Business Auto Policy and the Commercial Auto Excess Policy in an amount equal to the liability limits, to acknowledge in his or her own handwriting or by appropriate electronic means to acknowledge he or she has been given the

opportunity to select the limits of UM or UIM motor vehicle coverage listed on the form and have rejected the coverage.

87.    The Selection/Rejection forms promulgated by the West Virginia Insurance Commission require Westfield to provide the option of purchasing UM and UIM coverage with the Business Auto Policy and the Commercial Auto Excess Policy in an amount equal to the liability limits and require the signature of a named insured or applicant and the date the signature was placed on each Selection/Rejection form.

88.    The Certified Copy of the WVH&P Policy **(Exhibit 1)** does not include completed UIM or UM Selection/Rejection of coverage benefit forms compliant with the West Virginia Insurance Commission nor West Virginia Code 33-6-31(a), (b), (d)

89.    The UM and UIM Forms certified by Westfield for the WVH&P policy are unsigned, undated with non-selected amounts of UM or UIM coverage.

90.    Pursuant to West Virginia Code 33-6-31(a), (b), Westfield was required to make an effective offer of UM/UIM coverage at the time Westfield issued the Business Auto Policy and the Commercial Auto Excess policy which included an amount of coverage not less than the liability limit.

91.    The Westfield Business Auto Policy and the Commercial Auto Excess Policy were in effect at the time that the Plaintiff was seriously injured in an automobile accident with an uninsured driver and underinsured driver.

92.   Westfield failed to make an effective offer to WVH&P and failed to secure a knowing and informed waiver when WVH&P initially applied for liability insurance.

93.   The amount of coverage included in the Business Auto Policy by operation of law is the amount Westfield is required to offer under the statute. The amount of the limits of bodily injury liability insurance in the Policy is $1,000,000.00.

94.   The amount of coverage included in the Commercial Auto Excess Policy by operation of law is the amount Westfield is required to offer under the statute. The amount of the limits of bodily liability coverage included in the Commercial Auto Excess coverage is $2,000,000.00.

95.   The lack of completion of the Underinsured and Uninsured Motorist Coverage Offer forms for both the Business Auto Policy and the Commercial Auto Excess policy strips Westfield of the statutory presumption set forth in West Virginia Code 33-6-31D.

96.   Pursuant to West Virginia Code 33-6-31(a)(b), Westfield was required to make an effective offer of UM/UIM coverage at the time Westfield issued the Business Auto Policy and the Commercial Auto Excess policy to WVH&P but failed to do so.

97.   By operation of law, the WVH&P Business Auto Policy uninsured coverage limits are $1,000,000.00 and the underinsured limits are $1,000,000.00.

98.   By operation of law, the WVH&P Commercial Auto Excess uninsured coverage limits are $2,000,000.00 and the underinsured limits are $2,000,000.00.

99.   By separate letters dated February 2, 2022 and February 3, 2022, the Plaintiff, by counsel, made a request of Westfield for payment of the WVH&P Business Auto Uninsured Policy Limits and Underinsured Policy Limits and the Commercial Auto Excess Uninsured Policy Limits and Underinsured Policy Limits.

100.  Plaintiff's special damages, exclusive of general damages, to date are conservatively valued in excess of Five Million Dollars ($5,000,000.00).

101.  Inexplicably, Westfield proclaims that it made commercially reasonable offers of UM and UIM coverages to its insured with respect to both the Business Auto Coverage and the Commercial Auto Excess Coverage and that the insured made knowing and intelligent selection and rejection of the coverage benefits applicable to the Westfield policy while certifying as evidence of the requisite offers and selection/rejections are non-selected, unsigned and undated UM and UIM coverage forms provided in **Exhibit 1**.

102.  An actual controversy exists between Plaintiff and Westfield as to Plaintiff's claims relating to the amount of available uninsured motorist insurance coverage and the underinsured motorist coverage insurance under the WVH&P Westfield Business Auto Policy and the WVH&P Westfield Commercial Auto Excess Policy.

103.  The Westfield policy creates an obligation to pay the Plaintiff, the insured, all sums which he shall legally be entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle up to an amount not less than the limits of bodily injury liability insurance purchased by the insured without set off

against the insured's policy or any other policy for the injuries and damages applicable to the May 4, 2021 accident.

104.    Tyler Carroll is legally entitled to recover as compensation damages from the owner or driver of an uninsured motor vehicle operated by Kristy Pechinko and an underinsured motor vehicle operated by Charles T. Batton.

105.    Tyler Carroll sustained bodily injury caused by an accident.

106.    The harm, injuries, and damages to Tyler Carroll arise out of the ownership, maintenance, and use of an uninsured motor vehicle and an underinsured motor vehicle.

107.    The applicable limits bonds or policies have been exhausted by payment of settlements to Tyler Carroll.

## APPLICABLE LAW

108.    In full, **West Virginia Code §33-6-31d** states as follows**:**

**§33-6-31d. Form for making offer of optional uninsured and underinsured coverage.**

(a) Optional limits of uninsured motor vehicle coverage and underinsured motor vehicle coverage required by §33-6-31 of this code shall be made available to the named insured at the time of initial application for liability coverage and upon any request of the named insured on a form prepared and made available by the Insurance Commissioner. The contents of the form shall be prescribed by the commissioner and shall specifically inform the named insured of the coverage offered and the rate calculation for the coverage, including, but not limited to, levels and amounts of the coverage available and the number of vehicles which will be subject to the coverage. The commissioner shall provide for the use of electronic means of delivery and electronic signing when issuing the prescribed form. The form

shall allow any named insured to waive any or all of the coverage offered.

(b) Any insurer who issues a motor vehicle insurance policy in this state shall provide the form to each person who applies for the issuance of a policy by delivering the form to the applicant or by mailing the form to the applicant. Insurers may deliver the form by electronic means. Delivery by "electronic means" includes delivery of the form to an electronic mail address at which an applicant or policyholder has consented to receive notices or documents, by posting on an electronic network or site accessible via the Internet, electronic device, or mobile application, at or from which the applicant or policyholder has consented to receive delivery, or by any other delivery method that has been consented to by the applicant or policyholder. Any document delivered electronically satisfies any font, size, color, spacing, or other format requirements that are established for printed documents, provided that the format in the document delivered electronically has reasonably similar proportions or emphasis for the characters relative to the rest of the electronic document. The applicant shall complete, date, and sign the form and return the form to the insurer within 30 days after receipt of the form. Any signature executed in conformity with the Uniform Electronic Transactions Act in §39A-1-1 et seq. of this code is enforceable as provided by that act. An insurer or agent of the insurer is not liable for payment of any damages applicable under any optional uninsured or underinsured coverage authorized by §33-6-31 of this code for any incident which occurs from the date the form was mailed or delivered to the applicant until the insurer receives the form and accepts payment of the appropriate premium for the coverage requested in the form from the applicant: Provided, That if prior to the insurer's receipt of the executed form the insurer issues a policy to the applicant which provides for optional uninsured or underinsured coverage, the insurer is liable for payment of claims against the optional coverage up to the limits provided in the policy. The contents of a form described in this section which has been signed by an applicant creates a presumption that the applicant and all named insureds received an effective offer of the optional coverages described in this section and that the applicant exercised a knowing and intelligent election or rejection of the offer as specified in the form. The election or rejection is binding on all persons insured under the policy.

(c) Failure of the applicant or a named insured to return the form described in this section to the insurer as required by this section within the time periods specified in this section creates a presumption that the person received an effective offer of the optional coverages described in this section and that the person exercised a knowing and

19

intelligent rejection of the offer. The rejection is binding on all persons insured under the policy.

(d) The insurer shall make the forms available to any named insured who requests different coverage limits on or after the effective date of this section. An insurer is not required to make the form available or notify any person of the availability of the optional coverages authorized by this section except as required by this section.

(e) Notwithstanding any of the provisions of this article to the contrary, including §33-6-31f of this code, for insurance policies in effect on December 31, 2015, insurers are not required to offer or obtain new uninsured or underinsured motorist coverage offer forms as described in this section on any insurance policy to comply with the amount of the minimum required financial responsibility limits set forth in §17D-4-2(b) of this code. All offer forms that were executed prior to January 1, 2016, shall remain in full force and effect.

(f) If an insurer offers to place an insured with an affiliate of the insurer, the insurer shall make available a new uninsured and underinsured motorist coverage offer form, in the manner provided by and pursuant to subsections (a) and (b) of this section. A named insured shall complete, date, and sign the form as provided by subsection (b) of this section and return the form to the insurer within 30 days after receipt of the form. If an insured does not return the form within 30 days, then the last form previously signed by the insured for the insurer or any affiliate governs the amount of uninsured and underinsured motorist coverage provided by the newly issuing insurer and remains binding on all persons insured under the policy.

In full, **West Virginia Code §33-6-31 (a),(b)** states as follows:

**§33-6-31. Motor vehicle policy; omnibus clause; uninsured and underinsured motorists' coverage; conditions for recovery under endorsement; rights and liabilities of insurer.**

(a) No policy or contract of bodily injury liability insurance, or of property damage liability insurance, covering liability arising from the ownership, maintenance or use of any motor vehicle, may be issued or delivered in this state to the owner of such vehicle, or may be issued or delivered by any insurer licensed in this state upon any motor vehicle for which a certificate of title has been issued by the Division of Motor Vehicles of this state, unless it contains a provision insuring the named insured and any other person, except a bailee for hire and any persons specifically excluded by any restrictive endorsement attached to the policy,

20

responsible for the use of or using the motor vehicle with the consent, expressed or implied, of the named insured or his or her spouse against liability for death or bodily injury sustained or loss or damage occasioned within the coverage of the policy or contract as a result of negligence in the operation or use of such vehicle by the named insured or by such person: Provided, That in any such automobile liability insurance policy or contract, or endorsement thereto, if coverage resulting from the use of a nonowned automobile is conditioned upon the consent of the owner of such motor vehicle, the word "owner" shall be construed to include the custodian of such nonowned motor vehicles. Notwithstanding any other provision of this code, if the owner of a policy receives a notice of cancellation pursuant to article six-a of this chapter and the reason for the cancellation is a violation of law by a person insured under the policy, said owner may by restrictive endorsement specifically exclude the person who violated the law and the restrictive endorsement shall be effective in regard to the total liability coverage provided under the policy, including coverage provided pursuant to the mandatory liability requirements of section two, article four, chapter seventeen-d of this code, but nothing in such restrictive endorsement may be construed to abrogate the "family purpose doctrine".

(b) Nor may any such policy or contract be so issued or delivered unless it contains an endorsement or provisions undertaking to pay the insured all sums which he or she is legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle, within limits which shall be no less than the requirements of section two, article four, chapter seventeen-d of this code, as amended from time to time: Provided, That such policy or contract shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which he or she shall be legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle up to an amount of $100,000 because of bodily injury to or death of one person in any one accident and, subject to said limit for one person, in the amount of $300,000 because of bodily injury to or death of two or more persons in any one accident and in the amount of $50,000 because of injury to or destruction of property of others in any one accident: Provided, however, That such endorsement or provisions may exclude the first $300 of property damage resulting from the negligence of an uninsured motorist: Provided further, That such policy or contract shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which he or she is legally entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle up to an amount not less than limits of bodily injury liability insurance and property damage liability insurance purchased by the insured without set off against the insured's policy or any other policy. Regardless of whether motor vehicle coverage is offered and provided to an insured through a multiple vehicle insurance policy or contract, or in separate single vehicle insurance policies or

21

contracts, no insurer or insurance company providing a bargained for discount for multiple motor vehicles with respect to underinsured motor vehicle coverage may be treated differently from any other insurer or insurance company utilizing a single insurance policy or contract for multiple covered vehicles for purposes of determining the total amount of coverage available to an insured. "Underinsured motor vehicle" means a motor vehicle with respect to the ownership, operation or use of which there is liability insurance applicable at the time of the accident, but the limits of that insurance are either: (i) Less than limits the insured carried for underinsured motorists' coverage; or (ii) has been reduced by payments to others injured in the accident to limits less than limits the insured carried for underinsured motorists' coverage. No sums payable as a result of underinsured motorists' coverage may be reduced by payments made under the insured's policy or any other policy.

109.    The plain language of the W.Va. Code 33-6-31(a),(b) requires that every policy or contract of bodily injury liability insurance covering liability arising from the ownership, maintenance or use of any motor vehicle delivered in the State of West Virginia shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which he shall legally be entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle up to an amount not less than limits of bodily injury liability insurance purchased by the insured without set off against the insured's policy or any other policy.

110.    The Westfield WVH&P Business Auto Policy and the Commercial Auto Excess Policies issued to WVH&P are policies or contracts of insurance of the type specified in W.Va. Code 33-6-31 (b).

111.    Westfield was required to offer WVH&P an option to purchase both UM/UIM coverage up to the dollar limits of the liability insurance it purchased from Westfield on both the Business Auto Policy and the Commercial Auto Excess Policy.

112.    The Westfield policy issued to WVH&P does not comply with the statutory mandates and instead includes non-selected, unsigned, and undated UM/UIM forms which Westfield certified.

113.    The lack of the completion of the statutorily mandated forms strips Westfield of the statutory presumption that effective offers were made and that a rejection of said offers by the insured was knowing and informed.

114.    An insurance company's failure to use the West Virginia Insurance Commissioner's prescribed forms pursuant to West Virginia Code 33-6-31d (2011) results in loss of the statutory presumption and a reversion to the standards enunciated in _Bias v. Nationwide_, 179 W.VA. 125, 365 S.E.2d 789 (1987).

115.    Without the statutory presumption that an effective offer was made and that any rejection of said offer by the insured was knowing and informed, Westfield has the burden of proving that an effective offer was made in a commercially reasonable manner so as to provide the insured with adequate information to make an intelligent decision.  The offer must state, in definite, intelligible, and specific terms, the nature of the coverage offered, the coverage limits, and the costs involved and that any rejection of said offer was knowing and informed. _Bias v. Nationwide_, 179 W.VA. 125, 365 S.E.2d 789 (1987) and _Thomas v. McDermitt_, 232 W.Va. 159, 751 S.E.2d 264 (2013)

116.    The Policy certified by Westfield illustrates that no offer was made to the insured at the time of application for uninsured motorist coverage, underinsured motorist coverage nor excess uninsured motorist or excess underinsured motorist coverage.

117. Plaintiff is properly seeking declaratory relief pursuant to the Federal Declaratory Judgment Act as entry of declaratory judgment about the issues raised herein would terminate the controversy regarding the sole issue pending between the parties.

118. A declaratory judgment action is the proper procedure for an adjudication of the legal rights and duties of parties to an actual, existing controversy which involves the construction or application of a statute or statutes.

119. All parties having any claim or interest in the declaratory relief sought through this Complaint have been made parties to this proceeding.

120. Plaintiff requests a speedy hearing on this issue in accordance with Rule 57 of the Federal Rules of Civil Procedure.

**WHEREFORE**, Plaintiff, Tyler J. Carroll prays that this Court enters its Order declaring and adjudging as follows:

a) That the Policy of insured issued by Westfield National Insurance Company does afford uninsured and underinsured motorist coverage and excess uninsured motorist insurance coverage under the Policy which would respond in damages for the claims of Tyler J. Carroll;

b) That W.Va. Code 33-6-31(a),(b) requires that every policy or contract of bodily injury liability insurance covering liability arising from the ownership, maintenance or use of any motor vehicle delivered in the State of West Virginia shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which

he shall legally be entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle up to an amount not less than limits of bodily injury liability insurance purchased by the insured without set off against the insured's policy or any other policy;

c)    That the Westfield WVH&P Business Auto Policy and the Commercial Auto Excess Policy issued to WVH&P are policies or contracts of insurance of the type specified in W.Va. Code 33-6-31 (b);

d)    That Westfield was required to offer WVH&P an option to purchase both UM/UIM coverage up to the dollar limits of the liability insurance it purchased from Westfield on both the Business Auto Coverage and the Commercial Auto Excess Coverage;

e)    That the Westfield policy issued to WVH&P does not comply with West Virginia statutory mandates and instead includes non-selected, unsigned, and undated UM/UIM forms which Westfield certified.

f)    That the lack of the completion of the statutorily mandated forms strips Westfield of the statutory presumption that an effective offer was made and that any rejection of said offer by the insured was knowing and informed.

g)    That the lack of the completion of the statutorily mandated forms strips Westfield of the statutory presumption that an effective offer was made and that any rejection of said offer by the insured was knowing and informed placing a burden on Westfield to produce

25

evidence that an effective offer was made in a commercially reasonable manner so as to provide West Virginia Heating & Plumbing with adequate information to make an intelligent decision; that the offer must have stated, in definite, intelligible, and specific terms, the nature of the coverage offered, the coverage limits, and the costs involved; and that any rejection of said offer by West Virginia Heating & Plumbing was knowing and informed as mandated in *Bias v. Nationwide*, 179 W.Va. 125, 365 S.E.2d 789 (1987).

h)    That in the event Westfield cannot meet the requisite burden, then pursuant to the terms of the Westfield WVH&P Policy Number TRA-4175404 with effective dates 7/1/2020 to 7/1/2021 the Plaintiff is entitled to make a claim for a roll-up of uninsured and underinsured motorist coverage limits in an amount not less than the WVH&P Westfield business auto liability limits and the commercial auto excess limits as required under West Virginia Code 33-6-31(a)(b).

i)    And for such and other relief as this Court may deem just and proper.

**TYLER J. CARROLL**
By Counsel

*s/ Cynthia M. Ranson*
_____
**Cynthia M. Ranson, State Bar # 4983**
**J. Michael Ranson, State Bar # 3017**
RANSON LAW OFFICES, PLLC
1562 Kanawha Blvd., East
Charleston, West Virginia 25311
(304) 345-1990
jmr@ransonlaw.com
cmr@ransonlaw.com

Counsel for plaintiff